NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | : | |
|---|---|---|
| CHARLES MANASCO, | : | Hon. Faith S. Hochberg |
| | : | |
| Plaintiff, | : | Civil No. 01-1426 (FSH) |
| v. | : | |
| | : | **OPINION** |
| GRACE ROGERS, et al., | : | |
| | : | Date: September 1, 2006 |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

**HOCHBERG, District Judge:**

This matter comes before the Court upon Defendants' Grace Rogers, Glenn Ferguson, Albert Compoly, Lieutenant Gonzales, and Officer Miller (collectively, "the Defendants") Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.  The Court has reviewed the submissions of the parties and considered the motion on the papers in accordance with Fed. R. Civ. P. 78.

**I.     Factual Background and Procedural History.**

Plaintiff Charles Manasco ("Plaintiff") is a sexually violent predator involuntarily committed to the Special Treatment Unit ("STU") in Kearny, New Jersey pursuant to the New Jersey Sexually Violent Predator Act ("SVPA"), N.J.S.A. 30:4-27.24 et. seq.  The STU is a state facility specifically designated for the control, care and treatment of civilly committed sexual

offenders.  *Id.*  Plaintiff has been civilly committed to the STU since 2000.[1]

Defendant Grace Rogers is employed by the New Jersey Department of Corrections ("NJDOC") as Administrator of the STU.  Defendant Glen Ferguson is the New Jersey Department of Health Services ("NJDHS") Clinical Director of the STU.  Defendant Albert Compoly, is the former NJDHS Program Coordinator of the STU; in this capacity, he was responsible for supervising the STU's mental health staff.  Lieutenant Gonzales and Officer Miller are both Correctional Officers at the STU.

This action arises from an incident that occurred at the STU on February 1, 2001.  On the afternoon of that day, Officer Miller was escorting another STU resident out of the housing unit, when he encountered Plaintiff, who was sweeping a hallway in the STU.  According to Plaintiff, Officer Miller verbally harassed, demeaned, threatened him, and shoved his finger in Plaintiff's face.  Officer Miller claims that Plaintiff approached him and began to proffer obscenities, and threatened to use violence if Office Miller did not exit Plaintiff's housing area.  Plaintiff denies that he threatened Office Miller.

As a result of Plaintiff's behavior, Plaintiff was placed in the Restricted Activities Program ("RAP") – now referred to as the Modified Activities Program ("MAP").  RAP is a behavior modification program implemented by the NJDOC and the NJDHS.  It is designed to "prepare civilly committed sexual predators to safely return to the community" and focuses on "stabilizing disruptive or dangerous behaviors."  *M.X.L. v. New Jersey Dept. of Human Services/New Jersey Dept. of Corrections*, 379 N.J. Super 37, 45 (N.J.Super. 2005).

---

[1] Plaintiff was sentenced on July 27, 1989 to a prison term of twenty years after being convicted of first degree aggravated sexual assault, robbery, and receiving stolen property.

RAP consists of four levels: Room RAP, Tier RAP, Wing RAP and Program RAP. *Id.* "The level of [RAP] is proportionate to the apparent danger or instability reflected by the resident." *Id.* Plaintiff was initially placed in Room RAP, the most restrictive level. A resident committed to Room RAP is restricted to his room, even during meals, and is prohibited from movement on the tier. However, the resident may have visitors, make and receive phone calls, and is entitled to movement in his separate yard. The RAP rooms to which residents are confined each have a toilet and a sink. Tier RAP is the second most restrictive program. A resident committed to Tier RAP is entitled to all the same privileges as for Room RAP, but the resident is also entitled to movement around the tier. Plaintiff remained in Room RAP for approximately five days until February 6, 2001, and was subsequently moved to Tier RAP because his behavior had improved. Plaintiff was released from RAP on February 8, 2001.

A nurse reported that Plaintiff had suffered a "pseudo-seizure" on February 1, 2001. The nursing report indicates that Plaintiff was having "clonic, tonic movements." The nurse placed Plaintiff on a mattress and Plaintiff was allowed to go to sleep. On February 3, 2001, Plaintiff suffered another seizure while in RAP room. The nurse placed Manasco on his side and protected his head until the seizure stopped. In the medical report, the nurse reported: "no bodily injuries noted."

Plaintiff brought this action pursuant to 42 U.S.C. § 1983 on May 14, 2001. The Complaint challenges the constitutionality of his placement and detention in RAP, and alleges that Defendants' conduct violated Plaintiff's Eighth and Fourteenth Amendment rights. Specifically, Plaintiff contends that he was placed in RAP based on false charges in violation of his constitutional right to procedural due process. Plaintiff also asserts that during his placement

in RAP, he was provided constitutionally inadequate medical treatment, mental health care, and hygiene.

This Court dismissed Plaintiff's Eighth Amendment claims because Plaintiff is civilly committed, and not a prisoner. The Court also dismissed Plaintiff's equal protection, retaliation, and potential extension of confinement claims. The dismissal of these claims was upheld on appeal. On July 23, 2002, this Court granted summary judgment on favor of the Defendants on the remaining claims. On July 10, 2003, The Court of Appeals reversed, and remanded this matter for further proceedings. The Third Circuit held that there were genuine issues of material fact in dispute precluding summary judgment for the Defendants as to whether Plaintiff was placed in RAP based solely on "trumped-up charges," and as to whether he received adequate medical care and hygiene while in RAP. Following the remand, pro bono counsel was appointed to represent Plaintiff. Presently before the Court is Defendants' second motion for summary judgment.

**II.     Standard of Review.**

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, "summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences must be construed in the light most favorable to the non-

moving party.  *Peters v. Delaware River Port Auth.*, 16 F.3d 1346, 1349 (3d Cir. 1994).  The judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  *See Anderson*, 477 U.S. at 249. "Consequently, the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict."  *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 860 (3d Cir. 1990).

The party seeking summary judgment always bears the initial burden of production. *Celotex Corp.*, 477 U.S. at 323.  This burden requires the moving party to establish either that there is no genuine issue of material fact and that the moving party must prevail as a matter of law, or to demonstrate that the nonmoving party has not shown the requisite facts relating to an essential element of an issue on which it bears the burden.  *Id.* at 322-23.  This burden can be "discharged by showing ... that there is an absence of evidence to support the nonmoving party's case."  *Id*.  Once the party seeking summary judgment has carried this initial burden, the burden shifts to the nonmoving party.

To avoid summary judgment, the nonmoving party must then demonstrate facts supporting each element for which it bears the burden, thus establishing the existence of a "genuine issue of material fact" justifying trial.  *Miller*, 843 F.2d at 143; *accord Celotex Corp.*, 477 U.S. at 324.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id*. at 587 (quoting *First National Bank of*

*Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Further, summary judgment may be granted if the nonmoving party's "evidence is merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249-50.

### III.    Discussion.

To prevail under 42 U.S.C. § 1983 a plaintiff must demonstrate that: (1) he or she was deprived of a federal right secured by the Constitution, (2) by a person acting under color of state law. *Popow v. City of Margate*, 476 F.Supp. 1237, 1240 (3d Cir. 1970) (citing *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 150 (1970)).

As clarified during the February 1, 2006 Final Pretrial Conference, Plaintiff asserts the following claims against the following defendants:[2]

(1) <u>Against Defendants Miller, Rogers, Ferguson and Compoly</u>: Plaintiff's assignment to and detention in RAP deprived him of his right to procedural due process;

(2) <u>Against Defendants Rogers, Compoly and Ferguson</u>: Defendants failed to assess Plaintiff's medical and health capacity to withstand confinement in RAP and failed to monitor Plaintiff while he was in RAP in violation of his due process right to adequate medical care;

(3) <u>Against Defendants Compoly and Ferguson</u>: Defendants failed to provide Plaintiff with mental health care during his RAP confinement, in violation of his due process right to adequate conditions of confinement;

(4) <u>Against Defendants Gonzales</u>: Defendant deprived Plaintiff of adequate hygiene and of his personal property in violation of his due process right to adequate conditions of

---

[2] *See* February 1, 2006 Final Pretrial Telephone Conference at 14-15; *see also* Final Pretrial Order at 41-42.

.
.
.

.

confinement.[3]

The Defendants' Motion for Summary Judgment asserts qualified immunity. Plaintiff's responsive brief does not contain any opposition to the claim of qualified immunity. The general rule of qualified immunity protects government officials from civil liability for any action that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts have repeatedly emphasized that qualified immunity is "an immunity from suit rather than a mere defense to liability," and that as such, qualified immunity questions shall be resolved "at the earliest possible stage in litigation." *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) (citations omitted).

Claims of qualified immunity are analyzed under a two-step process. *Id.* The Court must first "determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Sutton v. Rasheed*, 323 F.3d 236, 250 n.27 (3d Cir. 2003) (citing *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (citations omitted)). If the plaintiff has alleged such deprivation, the Court must "proceed to determine whether that right was clearly established at the time of the alleged violation." *Id.* Accordingly, the Court first considers whether Plaintiff has offered sufficient evidence to establish a violation of his constitutional rights.

---

[3] Plaintiff's Counsel has confirmed that the Defendants are not being sued in their official capacities. *See* February 1, 2006 Final Pretrial Telephone Conference at 5. Consequently, the Court needs not consider whether Plaintiff's claims are barred by the Eleventh Amendment.

### A. Claims against Grace Rogers, Glenn Ferguson, and Albert Compoly

Plaintiff does not argue that Defendants Rogers, Ferguson, and Compoly are directly liable for violating Plaintiff's constitutional rights. Rather, Plaintiff contends that these Defendants were "directly responsible for articulating what the policies and practices of their respective departments and employees were" and that "the policies that they either created and didn't enforce resulted in the harm" allegedly suffered by Mr. Manasco. Transcript of January 31, 2006 Final Pretrial Conference at 4-5. Specifically, Plaintiff maintains that Defendants Rogers, Ferguson, and Compoly are liable "as policymakers" for (a) failing to institute a RAP assessment policy; (b) failing to implement the RAP monitoring policy. *See* Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 23-27. Plaintiff also argues that Defendant Ferguson, as Clinical Director of the STU, is liable for failing to train NJDHS staff adequately.[4]

---

[4] Plaintiff's theory of liability against Defendants Rogers, Ferguson and Compoly was raised for the first time in Plaintiff's Brief in response to Defendants' Motion for Summary Judgment. The Complaint nowhere alleges that these defendants should be held liable for formulating certain policies or improperly formulating certain policies.

Nor is the policymakers liability theory included in the "Plaintiff's Legal Issues" section of the Final Pretrial Order. *See* Final Pretrial Order at 41-42. Plaintiff's failure to preserve that issue in the Pretrial Order is a waiver of his policymaker liability claims against Defendants Rogers, Ferguson and Compoly. *See Metal Processing, Inc. v. Humm*, 56 F.Supp.2d 455, 471 (D.N.J. 1999) (citing *Basista v. Weir*, 340 F.2d 74, 84 (3d Cir.1965)) ("It is, of course, established law that a Pretrial Order when entered limits the issues for trial and in substance takes the place of pleadings covered by the Pretrial order."); *Colli v. Wirth*, No. 94 Civ. 3234 (LBS),1996 WL 442835, at *1 (S.D.N.Y. Aug. 6, 1996) ("It is an established procedural principle that a party's failure to include a legal theory or defense in the pretrial order results in its subsequent abandonment or waiver.").

Plaintiff concedes that respondeat superior is not a basis for liability under 42 U.S.C. § 1983.  *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978); *see* January 31, 2006 Final Pretrial Conference Transcript at 4.  When, as here, a plaintiff's constitutional claims implicates defendants in their roles as supervisors and policymakers, the plaintiff must show that the defendants (1) "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm," *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir.2004) ("*Luzerne*") (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir.1989)), or (2) that they "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations," *id.* at 586.

### 1.  Liability as Supervisors

To be held liable under § 1983, a defendant sued in his supervisory capacity must be "personally involved" in causing the alleged wrongdoing.  *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005).  Personal involvement can be demonstrated by showing that the defendant (a) participated in violating plaintiff's rights; (b) directed others to violate them; or (c) as a person in charge, had knowledge of and acquiesced in his subordinates' violation.  *Luzerne*, 372 F.3d at 586 (3d Cir. 2004) (citing *Baker v. Monroe Township*, 50 F.3d 1186, 1190-91 (3d Cir. 1995)).  Allegations of participation or actual knowledge and acquiescence must be made with appropriate particularity.  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir.1988).

In the present case, there is no evidence, and Plaintiff does not allege, that Defendants Rogers, Ferguson, and Compoly had any personal involvement in the alleged wrongs.  With respect to Defendant Rogers, the Administrator of the STU, the Complaint alleges:

> I wrote Grace Rogers in regard to being verbally assaulted on or about the date of February 20, 2001 and report my complaint to her being that she is the administrator of this said facility, I attempted to seek out a remedy for imprisonment and verbal harassment I received, for these things are Grace Rogers control. Grace Rogers is also aware of the officers working in this said facility and the conditions we live in. And from my understanding, she is responsible for the correction Dept.

When asked at his deposition to explain the basis for his claim against Defendant Rogers, Plaintiff stated that Ms. Rogers is part of the "administration of the building. Grace Rogers is part of that. She works in concert with the rest of them. She has to know what her staff is doing. It is her responsibility." No evidence has been proffered, however, that Defendant Rogers was aware of Plaintiff's complaints while in RAP. The record shows, to the contrary, that she was only contacted by Plaintiff on February 20, 2001, a week after he was released from RAP.

Similarly, no evidence has been adduced that Defendants Ferguson and Compoly had knowledge of Plaintiff's medical claims while he was in RAP. In his deposition, Plaintiff stated:

> Q: How did they [Ferguson and Compoly] damage you?
> A: Well, they damaged me by not giving me due process rights, by not allowing me to have the privileges of the Patients Bill of Rights, and by not giving me privileges under any kind of guidelines that I'd be able to enjoy. They damaged me by allowing me to be injured, not taking care of my well-being.
> Q: How did they allow you to be injured?
> A: By not governing the facility correctly.

In sum, there is no evidence that the Defendants either personally directed their subordinates to violate Plaintiff's constitutional rights or participated in violating Plaintiff's rights. Nor is any evidence proffered that these Defendants knew of their subordinates' conduct and acquiesced in it.

### 2. Liability as Policymakers

   a. Applicable Standard

In determining whether Defendants Rogers, Ferguson, and Compoly should be held liable under § 1983 as policymakers, Plaintiff argues that the Court should apply the "professional judgment" standard set forth by the Supreme Court in *Youngberg v. Romeo*, 457 U.S. 307 (1982). In *Youngberg*, the Supreme Court held that the Fourteenth Amendment due process rights of care and protection of an involuntary committed individual are violated "when the decision by the [medical] professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person actually did not base the decision on such a judgment." *Id.* at 323. Plaintiff maintains that the *Youngberg* standard applies in the instant case to non-medical administrative personnel because the "duty to provide adequate medical care includes the duty to adopt and implement policies to ensure that such care is provided." In support of this proposition, Plaintiff cites the Third Circuit decision in *Luzerne*. *Luzerne* involved a § 1983 suit by a juvenile detainee against the Luzerne County Juvenile Detention Center, and several of its administrators and staff. The plaintiff alleged that the defendants violated his substantive due process rights by failing to protect him from assault by other residents and by failing to treat him. In Count II of the Complaint, Plaintiff claimed that the defendants were liable in their individual capacities for developing inadequate policies and for failing to adequately supervise their subordinates. *Luzerne*, 372 F.3d at 578. In assessing the liability of the individual defendants as policymakers, the Third Circuit specifically adopted the deliberate indifference standard, stating that "[i]ndividual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the

consequences, established and maintained a policy, practice, or custom which directly caused [the] constitutional harm." *Id.* at 586; *Id.* at 579 ("We therefore conclude that this case is properly analyzed using the deliberate indifference standard.").

Plaintiff points to no authority holding that a different standard should apply under these circumstances. To the extent that the issue before this Court on remand, as formulated by Plaintiff, calls upon this Court to determine whether the individual defendants are liable for failing to enact or implement certain policies, Plaintiffs offer no sound justification for departing from the holding of *Luzerne*.

    b. Analysis

Plaintiff argues that Defendants Rogers, Ferguson and Compoly's failure to institute and/or implement a RAP medical assessment policy (to predict the effects of RAP on a resident with a seizure disorder) resulted in a deprivation of his constitutional right to adequate medical care. Plaintiff also argues that Defendant Ferguson, as Clinical Director of the STU, is liable for failing to train NJDHS staff adequately to implement the RAP monitoring policy.[5] In support of his contention, Plaintiff proffers that (a) "RAP program was jointly administered by both NJDOC and NJDHS;" (b) Defendant Rogers, as Administrator of the STU, was responsible for ensuring the "implementation of measures required for the protection and rehabilitation of the residents at the STU;" (c) Ferguson and Compoly "were responsible for drafting the RAP policy;" (d) these three defendants were responsible "for the fact that the existing RAP policy requiring medical monitoring of RAP residents with serious medical conditions ... was never implemented, such

---

[5] A supervisor's failure to train or supervise subordinates is actionable pursuant to § 1983 if such failure evidences "deliberate indifference" on the part of the supervisor. *See City of Canton v. Harris*, 489 U.S. 378, 379 (1989).

that, in effect, the policy did not exist." Plaintiff has submitted expert reports stating that the alleged failure to monitor was a departure from correctional neurological and psychiatric standards of care.

Thus, with respect to the three policymakers who are not medical professionals, the question is whether (1) their alleged failure to enact a pre-RAP medical assessment policy to predict the effect of RAP stress on a pre-existing medical condition, and (2) the alleged inadequacy of training and implementation of the existing policy to monitor residents confined to RAP was deliberately indifferent to Plaintiff's constitutional rights. "[A]cting or failing to act with deliberate indifference" is to recklessly disregard a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).

### 3. Qualified Immunity

The three policymakers' assertions that they are entitled to summary judgment based on qualified immunity are unopposed.[6] Plaintiff's decision not to oppose the application for qualified immunity does mean that summary judgment will be automatically granted in favor of Defendants. *Anchorage Assoc. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990). Rather, the Court "must first determine whether summary judgment is appropriate – that is, whether the moving party has shown itself to be entitled to judgment as a matter of law." *Id.*; Fed.R.Civ.P. 56(e) ( "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.").

---

[6] The Court commends the wisdom of Plaintiff's decision not to oppose qualified immunity to the individual policymaker defendants in light of the novel theory extending policymaker liability in this case.

Qualified immunity analysis asks whether Defendants' conduct, if proved, would violate a clearly established constitutional right of which a reasonable person would have known. *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "The contours of the right must be sufficiently clear that a reasonable policymaking official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In the present case, the issue is whether a reasonable official in the Defendants' position would have been aware that their alleged failure to institute a pre-RAP assessment policy or to adequately implement the existing RAP monitoring policy would violate Plaintiff's Fourteenth Amendment rights. Plaintiff has not cited any case suggesting that Plaintiff had a clearly established constitutional right to have a certain RAP policy exist. The record is devoid of any evidence that the three policymaker Defendants were aware of Plaintiff's medical complaints while in RAP, nor of any actual direct involvement in supervising Plaintiff's conditions of RAP confinement. Thus, Defendants Rogers, Ferguson, and Compoly are entitled to qualified immunity under both prongs of the *Saucier* analysis because the contours of the right claimed by Plaintiff against them surely was not sufficiently clear that a reasonable official would understand that what he or she was doing violates that right.[7]

---

[7] The question of the adequacy of current policies governing the treatment received by individuals committed under the SVPA is an important one. However, it is not within the province of this Court, in the context of an action for damages, to weigh the desirability of treatment protocols related to sexually violent predators, to the extent that such protocols reflect balancing considerations of public safety and clinical effectiveness. In August 2003, the New Jersey Legislature amended the SVPA to require that regulations be "promulgated jointly by the Commissioner of Human Services and the Commissioner of Corrections, in consultation with the Attorney General" taking into consideration "the rights of patients" and giving due regard "to security concerns and safety of the residents, treatment staff, custodial personnel and others in and about the facility." *See In re Commitment of V.A.*, N.J. Super 1, 6 (N.J.Super.2005) (citing N.J.S.A. 30:4-27.34d).

**B.  Claims against Lieutenant Gonzales for Lack of Hygiene**

Plaintiff claims that Lieutenant Gonzales is liable under § 1983 because he allegedly stated to another officer that "Manasco gets nothing" (hereinafter "the Gonzales Order"). Plaintiff contends that "[a]s a result of the Gonzales Order, [he] was deprived of adequate hygiene while in RAP."  Specifically, Plaintiff claims that he lost control of his bladder as a result of his seizure, and soiled his clothing.  He then told an unknown officer that he had wet himself, and asked for clean clothes, but according to Plaintiff, the officer gave him "prison looks" and walked away.  Plaintiff claims that he was not provided a change of clothing or an opportunity to bathe until five days later.

Plaintiff does not proffer that he heard Lieutenant Gonzales saying that he should get nothing in RAP.  He merely asserts that, through lip-reading, he saw "an unknown correction officer arrived and informed an unknown officer that Mr. Manasco was to 'get nothing,' and said it was 'by order of Lieutenant Gonzales.'"  Plaintiff, who is deaf, contends that his lip reading skills enabled him to understand the exchange of words.[8]

This is the evidence claimed to implicate Lieutenant Gonzales.  No evidence has been proffered from which a reasonable jury could infer that Lieutenant Gonzales was ever aware of Plaintiff's complaints of inadequate clothing or bedding after he later lost bladder control while he was in RAP.  The Court also notes that the meaning of the words allegedly spoken by Officer Gonzales to another officer, who allegedly relayed them to another officer, remains equivocal since RAP, by nature, constitutes a "reduction of privileges."  *M.X.L. v. New Jersey Dept. of Human Services/New Jersey Dept. of Corrections*, 379 N.J. Super 37, 48 (N.J.Super. 2005).

---

[8] This evidence would have some serious hearsay hurdles to overcome.

Plaintiff has not presented evidence from which a reasonable jury could infer that Defendant Gonzales violated "clearly established ... constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Court has no basis to reject Plaintiff's decision not to oppose qualified immunity as to Lieutenant Gonzales, and will thus enter summary judgment in favor of Defendant Gonzales.

### C. Claims against Officer Miller

The parties portray two differing versions of the events which gave rise to this lawsuit. Plaintiff denies that he threatened Officer Miller. He claims that he told Officer Miller "Why don't you leave this man alone? ... Why don't you go back to where you're supposed to be working?" According to Plaintiff, Officer Miller shoved his finger in Manasco's face and said "Shut the fuck up, Manasco," and called Manasco a "pussy mother fucker from Avenel," to which Manasco responded by saying "[j]ust take your finger out of my fucking face." In support of his assertions, Plaintiff has produced declarations of three other residents who witnessed the incident. Officer Miller, in contrast, proffers that Mr. Manasco told him to "get the fuck off the unit" and that he was going to "kick [Miller's] fucking ass."

As the Third Circuit noted in its decision, there remains a genuine issue of fact as to whether Miller caused an encounter with Plaintiff with the ulterior motive of placing him in RAP. Although Defendant Miller's assertion of qualified immunity is also unopposed, whether Officer Miller is entitled to qualified immunity depends on the disputed question of his motivation for placing Mr. Manasco in RAP. *See Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006) (stating that "[a]lthough qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be

determined by the jury."). Accordingly, the Court denies summary judgment on the claims asserted against Officer Miller.

## IV.  Conclusion.

For the reasons stated above, Defendants' Motion for Summary Judgment is granted in part and denied in part. A trial will be scheduled for the claims against Officer Miller. An appropriate order will issue.

/s/ Faith S. Hochberg
**Hon. Faith S. Hochberg, U.S.D.J.**
